# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER COTTINGHAM, | : | CIVIL NO.: 1:24-cv-02130 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FRANK BISIGNANO,[1] | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. Introduction.

In this social security action, Plaintiff Christopher Cottingham seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. We have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons

---

[1] Frank Bisignano is now the Commissioner of Social Security, and he is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

set forth below, we will vacate the Commissioner's decision and remand the case to the Commissioner for further proceedings.

## II.  Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 7, 7-1, 7-2.*[2]  In October 2018, Cottingham filed an application for disability insurance benefits and an application for supplemental security income, alleging that he has been disabled since July 1, 2018. *See Admin. Tr.* at 123–131.  After the Commissioner administratively denied his claims, *id.* at 132–35, 160–64, Cottingham requested an administrative hearing, *id.* at 169–171.  On January 28, 2020, Cottingham—who was represented by counsel—as well as a vocational expert testified at a hearing before Administrative Law Judge Scott Staller (the "ALJ"). *Id.* at 74–93.  On February 28, 2020, the ALJ denied Cottingham's claims for benefits. *Id.* at 107-21.

Cottingham appealed the ALJ's decision to the Appeals Council, which granted his request for review, vacated the ALJ's decision, and remanded the case to the ALJ. *Id.* at 147–54.  The Appeals Council remanded the case to the ALJ for the ALJ to take the following actions and resolve the following issues: (1) obtain a

---

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Cottingham's claims.

complete copy of an exhibit that was missing hundreds of pages; (2) address the statement of Cottingham's mother; (3) "[o]btain additional evidence concerning [Cottingham]'s impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence"; (4) "[f]urther evaluate [Cottingham]'s alleged symptoms and provide [a] rationale in accordance with the disability regulations pertaining to evaluation of symptoms"; and (5) further consider Cottingham's "maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations." *Id*. at 150–51 (citations omitted).

After remand, on July 10, 2023, Cottingham appeared with counsel at another hearing before the ALJ. *Id*. at 49–73. Cottingham testified at the hearing as did a vocational expert. *Id*. On April 3, 2024, the ALJ conducted a third hearing. *Id*. at 33–48. Cottingham, who was represented by counsel, was present as was a vocational expert, but neither of them testified. *Id*. Rather, only a medical expert—Dr. Krishnan—testified. *Id*.

On April 23, 2024, the ALJ denied Cottingham's claims for benefits. *Id*. at 9–32. Cottingham appealed the ALJ's decision to the Appeals Council, which denied his request for review. *Id*. at 1–6. This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In December 2024, Cottingham, represented by counsel, began this action by filing a complaint seeking review of the Commissioner's decision denying his claims. *See Doc. 1*.  He requests that the court reverse the Commissioner's decision and award him benefits or, in the alternative, remand the case for further proceedings. *Id*. at 3–4 (Wherefore Clause).  He also seeks "such relief" as the court deems justified, including attorney's fees. *Id*. at 4.

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 5*.  The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 6, 7*.  The parties filed briefs, *see docs. 14, 16, 19*, and this matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).  But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019).  "[T]he threshold for such evidentiary

sufficiency is not high." *Biestek*, 587 U.S. at 103. Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Cottingham is disabled, but whether substantial evidence supports the Commissioner's finding that he is not disabled and whether the Commissioner correctly applied the relevant law.

## B. Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II or Title XVI of the Social Security Act, a claimant generally must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. §1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).

Further, to receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[3]  Unlike

---

[3] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)). "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id*. (citing 42 U.S.C. § 416(i)(2)).  Here, the ALJ determined that Cottingham met the insured-status requirements through January 1, 2026. *Admin. Tr.* at 13, 15.  We note that in his earlier opinion, the ALJ stated that Cottingham met the insured-status requirements through September 30,

with disability insurance benefits under Title II of the Social Security Act, "[i]nsured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits" under Title XVI of the Social Security Act. *Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar. 22, 2017).  Supplemental Security Income "is a federal income supplement program funded by general tax revenues (not social security taxes)" "designed to help aged, blind or other disabled individuals who have little or no income." *Id*.

The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a).  Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is "'that which an

---

2018. *Id*. at 113.  And September 30, 2018, is the date that appears in various other places in the record. *See, e.g.*, *id*. at 54, 98, 139.  But because neither party raises an issue regarding the date last insured, we do not address the issue.

individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).  But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The

8

"ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV.  The ALJ's Decision.

On April 23, 2024, the ALJ denied Cottingham's claims for benefits. *Admin. Tr.* at 9–32.  He proceeded through the five-step sequential-evaluation process.

### A.  Step One.

At step one of the sequential-evaluation process, the ALJ found that Cottingham had not engaged in substantial gainful activity since his alleged onset date of July 1, 2018. *Id.* at 15.

### B.  Step Two.

At step two of the sequential-evaluation process, the ALJ found that Cottingham had the following severe impairments: subarachnoid hemorrhage and intracranial aneurysm; migraines; hypertension; depression; and neurocognitive disorder. *Id*.  The ALJ also found that Cottingham had several other medically determinable impairments that are non-severe. *Id*.  He further determined that although Cottingham alleges issues with his right leg, he does not have a medically

determinable impairment regarding his right leg. *Id.* And, "even if [Cottingham]'s right leg symptoms could reasonably [be] attributed to one of [Cottingham]'s medically determinable impairments, such alleged symptoms would not require any limitations in [Cottingham]'s residual functional capacity." *Id.* at 15–16.[4]

### C. Step Three.

At step three of the sequential-evaluation process, the ALJ found that Cottingham did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 16–18. Specifically, with regard to Cottingham's hypertension, the ALJ considered the listings under section 4.00 of the listings, and with regard to Cottingham's subarachnoid hemorrhage he considered Listing 11.04. *Id.* at 16.

The ALJ also stated that "[w]hile there is no specific Listing for migraine headaches, SSR 19-4p provides in pertinent part that a primary headache disorder may be found to medically equal the requirements of Section 11.02 of the Listings." *Id.* But, the ALJ concluded, "the evidence of record does not indicate that an acceptable medical source has opined that [Cottingham]'s migraine headaches medically equal the requirements of Section 11.02 of the Listings." *Id.*

---

[4] For readability purposes, here—and elsewhere—when citing or quoting the ALJ's decision, we omit the ALJ's citations to regulations as well as citations to the record.

The ALJ further considered Listings 12.02 and 12.04 in connection with Cottingham's mental impairments. *Id*.  In doing so, he considered the four broad areas of mental functioning set forth in the disability regulations for evaluating mental disorders[5] and in the listings, known as the paragraph B criteria.[6]  The ALJ determined that Cottingham had mild limitations in understanding, remembering, or applying information and in adapting or managing oneself. *Id*. at 16–17.  And, the ALJ determined, he has moderate limitations in interacting with others and in concentrating, persisting, or maintaining pace. *Id*. at 17.

---

[5] When "mental impairments are at issue, additional inquiries are layered on top of the basic five-step disability analysis." *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 202 (3d Cir. 2019).  The regulations set forth a "special technique" used for evaluating mental impairments. *See* 20 C.F. R. § 404.1520a.  As part of that "special technique," a claimant's degree of functional limitation is rated in four broad functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id*. at § 404.1520a(c)(3).  A claimant's degree of limitation in these functional areas is rated using "the following five-point scale: None, mild, moderate, marked, and extreme." *Id*. at § 404.1520a(c)(4).  The ratings in these four broad functional areas are used at Step 2 to determine if the claimant has a severe mental impairment, and if the claimant has a severe mental impairment, the ratings are also used at Step 3 to determine if the claimant's severe mental impairment meets or equals a listed mental disorder. *Id*. at § 404.1520a(d).

[6] The listings for mental disorders contain either two paragraphs (A and B) or three paragraphs (A, B, and C). *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00.A.2.  Except as to Listing 12.05 (intellectual disorder), paragraph B of each of the listings for the mental disorders sets forth the same four functional criteria as set forth in 20 C.F. R. § 404.1520a, and the listings use the same five-point rating scale as those regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00.A.2.b, 12.00.E, 12.00.F.  This is what the ALJ is referring to when he refers to the paragraph B criteria.

11

"Because [Cottingham]'s mental impairments do not cause as least two 'marked' limitations or one 'extreme' limitation," the ALJ concluded that the paragraph B criteria were not satisfied. *Id*.  The ALJ recognized that the paragraph B criteria are not an RFC; rather, they "are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process[,]" and the RFC "assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." *Id*. at 18.  And he asserted that the RFC that follows "reflects the degree of limitation" he "has found in the 'paragraph B' mental function analysis." *Id*.  The ALJ also determined that Cottingham did not satisfy the paragraph C criteria. *Id*. at 17.

## D.  The RFC.

The ALJ then determined that Cottingham had the RFC to do light work[7] with some limitations. *Id*. at 18.  He concluded that Cottingham "can understand, remember, or carry out simple instructions." *Id*.  And he explained that "[s]imple

---

[7] *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").

instructions can be easily understood, easily performed, basic, not complicated, clear and straightforward." *Id*.  The ALJ also concluded that Cottingham "can perform tasks that do not involve a specific production rate pace, such as assembly line work or an hourly production quota" and he "can deal with occasional changes in a routine work setting." *Id*.  The ALJ further concluded that Cottingham can "make judgments on simple, work-related decisions," and he "can occasionally interact with the public, coworkers, and supervisors in a routine work setting." *Id*.

In making this RFC assessment, the ALJ considered Cottingham's testimony and assertions regarding his limitations. *Id*. at 18–19.  The ALJ concluded that although Cottingham's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id*. at 19.  The ALJ also considered Cottingham's medical records as to his physical and mental impairments and the treatment he received. *Id*. at 19–21.  And he concluded that the medical records indicate that Cottingham's treatment is effective in limiting his symptoms related to both his severe physical impairments as well as his severe mental impairments, and he does not experience symptoms or limitations related to his severe impairments to the extent he alleges. *Id*. at 20, 21.

The ALJ also concluded that although Cottingham "alleged experiencing medication side effects of confusion, fatigue, and dizziness," his medical records do not show either that he "persistently reported experiencing such medication side effects" or that he was "persistently assessed with any abnormal clinical examination findings that were attributable to [his] medication regimen by an acceptable medical source." *Id*. at 21–22. Thus, the ALJ concluded, Cottingham "does not experience any medication side effects with such frequency, intensity, or persistence that they require any accommodation in his residual functional capacity." *Id*. at 22.

The ALJ further considered the medical opinions in the record. *Id*. at 22–23. Specifically, he considered and found unpersuasive the opinions of Brennan Ross, PA-C, who was one of Cottingham's treatment providers. *Id*. at 22. He considered and found persuasive the opinion of a state agency medical consultant. *Id*. at 22–23. And finally, the ALJ considered the opinion of Dr. Krishnan, the medical expert who testified at the third hearing. *Id*. at 23.[8] After summarizing Dr. Krishnan's opinion, the ALJ concluded that it was supported by Dr. Krishnan's review of Cottingham's medical records and generally consistent with

---

[8] Although the ALJ incorrectly referred to Dr. Krishnan as a vocational expert, it is clear from his discussion that he knew Dr. Krishnan was a medical expert. *See Admin. Tr.* at 23.

Cottingham's medical records. *Id*.  But the ALJ concluded that Dr. Krishnan's opinion was not completely consistent with the medical records:

> . . . However, the aspects of Dr. Krishnan's opinion pertaining to being off task and exposure to noise is not consistent with the lack of any ongoing abnormal clinical examination findings pertaining to attention and concentration and notations in [Cottingham]'s medical records indicating [Cottingham] was noted to be alert and oriented times three and [Cottingham] was noted to be in no distress.  Furthermore, the aspect of Dr. Krishnan's opinion pertaining to vibration is not consistent with clinical examination findings of 5/5 strength of the wrists, feet, and knees, no pronator drift, normal muscle tone, 5/5 strength, a smooth moving gait, and intact motor and sensory functioning of the lower extremities.  Additionally, the aspects of Dr. Krishnan's opinion regarding lifting and carrying does not adequately consider all of [Cottingham]'s symptoms related to [Cottingham]'s severe impairments.

*Id*.  Thus, the ALJ found Dr. Krishnan's opinion persuasive only "to the extent it indicates [Cottingham] is capable of performing a range of work at the light exertional level." *Id*.

The ALJ also considered the statement of Cottingham's mother, and he found her statement not persuasive on the basis it was not consistent with Cottingham's medical records. *Id*. at 23–24.

The ALJ then summarized the reasons for his RFC assessment:

> As discussed above, [Cottingham]'s allegations regarding his symptoms and limitations are not consistent with all of the evidence of record.  However, the undersigned has accommodated some degree of [Cottingham]'s symptoms related to his severe physical impairments in his residual functional capacity by limiting [Cottingham] to work at the

15

> light exertional level.  Additionally, to accommodate some degree of [Cottingham]'s symptoms related to his mental impairments, the undersigned has limited [Cottingham] to jobs that include understanding, remembering, or carrying out simple instructions, no specific production rate pace, such as assembly line work or an hourly production quota, occasional changes in a routine work setting[,] making judgments on simple, work-related decisions, and occasional interaction with the public, coworkers, and supervisors in a routine work setting

*Id*. at 24.

### E.  Step Four.

At step four of the sequential-evaluation process, the ALJ found that Cottingham could not perform his past relevant work as a heavy equipment operator and a stevedore. *Id*.

### F.  Step Five.

At step five of the sequential-evaluation process, considering Cottingham's age, education, work experience, and RFC, as well as the testimony of a vocational expert, the ALJ found that there were jobs—such as inspector, sorter, and assembler—that exist in significant numbers in the national economy that Cottingham could perform. *Id*. at 25.

In sum, the ALJ concluded that Cottingham was not disabled from July 1, 2018 (which is the alleged onset date), through the date of the ALJ's decision on

April 23, 2024. *Id*. at 25–26.  Thus, he denied Cottingham's claims for benefits. *Id*.

at 26.

## V.  Discussion.

Cottingham presents several claims.  We begin by addressing his claim that

the ALJ erred at step three of the sequential-evaluation process.  Cottingham

contends that the ALJ failed to address Listing 11.02 with regard to his headaches.

For the reasons discussed below, we conclude that the ALJ erred at step three by

failing to articulate whether Cottingham's headaches are equivalent to Listing

11.02.  Before we address Cottingham's specific contentions, we set forth the

standards applicable to the step three analysis of headaches.

### A.  Step 3 and Headaches.

Appendix 1 of 20 C.F.R. Part 404, Subpart P ("Listing of Impairments")

describes, for each major body system, impairments that the Commissioner

considers to be severe enough to prevent a claimant from doing any gainful activity

regardless of the claimant's age, education, or work experience. 20 C.F.R.

§ 404.1525(a).  "Each impairment is defined in terms of several specific medical

signs, symptoms, or laboratory test results." *Sullivan v. Zebley*, 493 U.S. 521, 530

(1990).  "[T]he medical criteria defining the listed impairments" is set "at a higher

level of severity than the statutory standard." *Id*. at 532.  "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Id*. (italics in original).  "The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Id*.  If a claimant's impairment meets or is equivalent to a listed impairment, then the claimant "is *per se* disabled and no further analysis is necessary." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).  But "[i]f a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

"In step three, the ALJ must determine whether [the claimant's] impairment matches, or is equivalent to, one of the listed impairments." *Burnett*, 220 F.3d at 119.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Zebley*, 493 U.S. at 530 (italics in original); *see also* 20 C.F.R. § 404.1525(c)(3) ("We will find that your impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement."); 20 C.F.R. § 404.1525(d) ("To meet the requirements of a listing,

18

you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing."). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530 (footnote omitted). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for [a] listed impairment." *Id*. at 531 (italics in original) (footnote omitted); *see also* 20 C.F.R. § 404.1526(a) ("Your impairment(s) is medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment.").

The Third Circuit "requires the ALJ to set forth the reasons for his decision" at step three. *Burnett*, 220 F.3d at 119. The purpose of this requirement "is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett*, 220 F.3d at 120). "Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009). This is because a bare conclusion that an impairment does not meet or equal a listing "'is beyond meaningful judicial review.'" *Burnett*, 220 F.3d at 119 (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)). But the ALJ is not required "to

19

use particular language or adhere to a particular format in conducting his analysis." *Jones*, 364 F.3d at 505.  And the ALJ's decision must be "read as a whole[.]" *Id*.

Consistent with the principle that the ALJ's decision must be read as a whole, "where an ALJ's conclusion at step three is not adequately articulated, courts may review the ALJ's entire decision before determining whether remand is required." *Izalia V. v. O'Malley*, No. 4:22-CV-1819, 2024 WL 4505469, at *5 (M.D. Pa. Oct. 16, 2024).  "In other words, 'the Court must determine whether the evidentiary discussion—regardless of its placement in the ALJ's decision— supports meaningful judicial review of the challenged Step Three finding(s) pursuant to the applicable legal standards." *Fewell v. O'Malley*, No. 1:23-CV-00865, 2024 WL 4182115, at *4 (M.D. Pa. Aug. 19, 2024) (quoting *Gonzalez v. Saul*, No. 1:17-CV-02524 (PAZ), 2019 WL 13401378, at *12 (D.N.J. Oct. 31, 2019)), *report and recommendation adopted*, 2024 WL 4173790 (M.D. Pa. Sept. 12, 2024).  In this vein, the Social Security Administration issued a Social Security Ruling which, among other things, sets forth articulation requirements for step 3 findings about medical equivalence. Soc. Sec. Ruling 17-2p, *Titles II & XVI: Evidence Needed by Adjudicators at the Hearings & Appeals Council Levels of the Admin. Rev. Process to Make Findings About Med. Equivalence*, 2017 WL 3928306 (S.S.A. Mar. 27, 2017) ("SSR 17-2p").  SSR 17-2p provides that if an ALJ "believes that the evidence already received in the record does not reasonably

support a finding that the individual's impairment(s) medically equals a listed impairment, the [ALJ] is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id*. at *4.  Rather, "[g]enerally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding." *Id*.  And "[a]n ALJ's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3." *Id*. "Nonetheless, for an unarticulated medical equivalency finding to be upheld[,] an ALJ's decision as a whole 'must still enable this court to follow the ALJ's reasoning in determining that Plaintiff's impairment is not the medical equivalent of the listing' Plaintiff alleges on appeal" and "[i]f it does not, remand is required." *Izalia V.* 2024 WL 4505469, at *5.

There is no listing for migraine headaches. *See Soc. Sec. Ruling 19-4p, Titles II & XVI: Evaluating Cases Involving Primary Headache Disorders*, 2019 WL 4169635 (S.S.A. Aug. 26, 2019) ("SSR 19-4p") ("Primary headache disorder is not a listed impairment in the Listing of Impairments (listings).").  But "SSR 19-4p explains how primary headache disorders, like migraines, are evaluated at step three." *Tyson v. Kijakazi*, 1:21-CV-855, 2022 WL 3975002, at *10 (M.D. Pa. July

21

25, 2022), *report and recommendation adopted*, 2022 WL 3971041 (M.D. Pa. Aug. 31, 2022)).  SSR 19-4p provides that "a primary headache disorder, alone or in combination with another impairment(s)" may "medically equal[] a listing." *SSR 19-4p*, 2019 WL 4169635 at *7.  And it identifies Listing 11.02, which addresses epilepsy, as "the most closely analogous listed impairment" for a primary headache disorder. *Id*.  More specifically, SSR 19-p4 provides that "[w]hile uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) [medically determinable impairment(s)] medically equals the listing." *Id.*  "Thus, an ALJ should look to Listings 11.02B and 11.02D in assessing whether a claimant's migraine headache impairment medically equals a listing." *Tyson*, 2022 WL 3975002 at *10.

"Listing 11.02B describes dyscognitive seizures 'occurring at least once a week for at least 3 consecutive months . . . despite adherence to prescribed treatment.'" *Falardo-Weller v. Kijakazi*, NO. 3:22- CV-01026, 2023 WL 6119101, *6 (M.D. Pa. Sept. 18, 2023) (quoting 20 C.F.R. Part 404, Subpart P, App.1, § 11.02B).  "To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B," the ALJ should consider the following factors:

> [(1)] A detailed description from an AMS [acceptable medical source] of a typical headache event, including all associated

22

phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); [(2)] the frequency of headache events; [(3)] adherence to prescribed treatment; [(4)] side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and [(5)] limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4P, 2019 WL 4169635 at *7.

Listing 11.02D, on the other hand, "requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one" of the following areas: "[p]hysical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself." *Id.*  In evaluating 11.02D, the ALJ should consider the same factors—set forth above—for considering 11.02B. *Id.*

**B.  The ALJ erred in connection with the analysis of Cottingham's headaches.**

Cottingham contends that the ALJ failed to adequately adddress Listing 11.02 in accordance with SSR 19-4p.  We agree.

23

The ALJ's step three analysis regarding Cottingham's migraine headaches is cursory: it reads in full:

> While there is no specific Listing for migraine headaches, SSR 19-4p provides in pertinent part that a primary headache disorder may be found to medically equal the requirements of Section 11.02 of the Listings.  However, the evidence of record does not indicate that an acceptable medical source has opined that [Cottingham]'s migraine headaches medically equal the requirements of Section 11.02 of the Listings.

*Admin. Tr.* at 16.

Cottingham contends that the ALJ failed to adequately consider whether his migraines are medically equivalent to Listing 11.02 because he failed to address the factors set forth in SSR 19-4p.  And, according to Cottingham, the record demonstrates that he suffers from debilitating headaches:

> Treatment notes reveal Mr. Cottingham started suffering from debilitating headaches—On July 16, 2018, Mr. Cottingham reported that he fell two days ago and has had a headache/nausea and vomiting since, he also could not remember how he fell.  He had a CT scan done and the findings indicated an aneurysm and subdural hemorrhage and [he] was given Tylenol, Zofran, and morphine.  The following day a procedure was done to clip and stabilize the aneurysm and bleeding.  He was discharged [t]wo weeks later July 30, 2018.
> On July 31, 2018, post brain surgery for intracranial hemorrhage, Mr. Cottingham reported having a headache near the incision site and indicated that earlier today he had fainted and hit his head.  Mr. Cottingham was given a CT of his head and brain without contrast and impressions indicated Postsurgical changes of right frontotemporal craniotomy and aneurysm clipping in the right parasailer region, small subdural collection subjacent to the craniotomy defect noted without substantial mass effect upon the adjacent brain parenchyma and

new focal hypodensity involving the right caudate and anterior limb of the right internal capsule, concerning for recent infarction.  On August 1, 2018, Mr. Cottingham had a CTA of his neck with and without contrast.  It indicated post recent anterior communicating artery aneurysm coiling with newly diagnosed right basal ganglia st[r]oke.

On August 23, 2018, Mr. Cottingham had another CTA of his head which revealed broad-based right ACOM junction aneurysm with a small exophytic cranial extension.  On August 27, 2018, Mr. Cottingham reported having a throbbing headache for the past two days that is all over with pain radiating down into neck.  He also mentions weakness all over and hallucinations.

In December 2018, Mr. Cottingham reported having short memory loss, difficulty articulating certain thoughts, fatigue, and daily migraines.  In January 2019, Mr. Cottingham reaffirmed memory and coordination problems along with his headaches.  He indicated that these headaches occurred 3-4 times a week and that he is feeling very limited in what he can do.  On March 15, 2019, Mr. Cottingham received a CT of his brain and head.  Findings indicated that the right vertebral artery is hypoplastic in the brain.  In April 2019, Mr. Cottingham had a bilateral carotid duplex ultrasound completed.  Later in the month Mr. Cottingham reported headaches happening more often in the past month as well as blurred vision and some photophobia.

In August 2019, Mr. Cottingham continued having short-term memory problems.  He also mentions continuing headaches with eye pressure and photophobia.  In December 2019, Mr. Cottingham reported having increased migraines in the past 3 weeks.  He continued indicating he has photophobia but says this is essentially always present as well as instances of dizziness.

. . . In April 2022, Mr. Cottingham indicated that his headaches have been returning and increasing frequently, he also has issues with focus, concentration and short-term memory loss since the aneurysm.  He indicated that he gets headaches almost daily that are around the front and top part of his incision and feel like pounding and throbbing, as well as can be debilitating.  In May 2022, Mr. Cottingham reported that he

25

was unable to drive for long due to focus and concentration as well as increased headaches when doing so.  He also described that someone trying to help him focus and dimly lit rooms make his headaches worse. *Id.*  In July 2022, Mr. Cottingham described still being unable to drive for long periods due to headaches.  He also indicated struggling with memory and focus as well as having worsening vision due to his aneurysm.

        . . . On August 25, 2022, Mr. Cottingham reported having headaches about 5 times a week that never go away completely, worsened by bright lights, loud sounds, standing, getting up, stooping down, coughing, sneezing, and smoking.  He also indicated that these headaches are on the front and top of his head bilaterally and feel like a pulsation. . . . He was reported to be in moderate distress due to headache.  He was prescribed lisinopril[.]

        In September 2022, Mr. Cottingham continued reporting headaches and indicated he can sometimes see spots in his vision during these episodes.  . . . At a follow-up neurology appointment in December 2022, Mr. Cottingham reported continuing headaches and dizzy spells where he loses his balance as well.  He reported that since his aneurysm he has had headaches, but they are now increasing in intensity and frequency.  He describes these headaches to feel like pounding and throbbing, as well as that they are worsened by light and can be debilitating.  In January 2023, Mr. Cottingham reaffirmed headaches and dizziness.

        On March 25, 2023, Mr. Cottingham was admitted to the emergency department with a worsening headache as well as lightheadedness, dizziness, nausea, and photophobia.  He was given a migraine cocktail . . . [.]  He was prescribed Fioricet. He was discharged the following day.

        At the 2023 hearing, Mr. Cottingham testified that since his July 2018 aneurysm, he suffered from frequent migraines associated with nausea, light sensitivity, and noise sensitivity. His migraine could last between one to four migraine headaches and during a migraine, he needed to lie down in a qui[et] dark room.  Medical expert S. Krishnan, M.D. testified that Mr. Cottingham's headaches lasted one to two hours, and that his

headaches "certainly would affect his concentration, pace quite frequently."

*Doc. 14* at 12–16 (citations to the record omitted).[9]

Citing SSR 17-2p, the Commissioner contends that the ALJ's discussion was sufficient because he addressed Cottingham's headaches in connection with his RFC assessment.[10]  We agree with the Commissioner that we must look to the ALJ's decision as a whole, including his discussion in connection with the RFC

---

[9] We note that the scan quality of some of the medical records in this case is poor, making them very difficult to read.  As to those records, here—and elsewhere—because no party has argued that the other party or the ALJ has incorrectly cited documents, when the parties or the ALJ cites to those records, we accept that they say what the parties or the ALJ say that they say.  In that vein, we note that the Commissioner does not dispute the above summary set forth by Cottingham.  Also, although Cottingham sets forth the above summary in one incredibly long paragraph (spanning five pages of his brief), to enhance readability, we have broken the above summary into paragraphs.

[10] The Commissioner also asserts that the ALJ found that Cottingham "was not seriously limited in understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; or adapting or managing oneself." *Doc. 16* at 10.  And the Commissioner notes that these areas of functioning are relevant to Listing 11.02. *Id.*  As the summary of SSR 19-4p set forth earlier shows, to be medically equivalent to 11.02D, a marked limitation is required in one of the five following areas: "[p]hysical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself." *Id.*  As the Commissioner asserts, the ALJ did not find a marked limitation in the latter four areas when he was discussing the paragraph B criteria of other listings.  But the ALJ did not specifically address whether Cottingham has a marked limitation in "physical functioning" when he addressed the paragraph B criteria because that is not one of the paragraph B criteria.  Thus, we still need to look to the ALJ's RFC assessment.  Moreover, as set forth in SSR 19-4p, a marked limitation is required only as 11.02D.  Thus, we still need to look to the ALJ's RFC discussion as to 11.02B.

assessment. But reading the ALJ's decision as a whole—including his discussion of Cottingham's headaches in connection the RFC assessment—we nevertheless conclude that the ALJ's step three analysis is beyond meaningful judicial review.

Here, in connection with his RFC assessment, the ALJ acknowledged that Cottingham testified that he experiences debilitating headaches. *Admin. Tr.* at 18–19. But he concluded that Cottingham's medical records "contain substantial medical evidence that is not consistent with [his] allegations pertaining to [his] severe physical limitations. *Id.* at 19. And the ALJ set forth a summary of the records that—in his opinion—are not consistent with Cottingham's assertions. *Id.* at 19–20. But that summary includes only two references to Cottingham's headaches. *Id.* at 19–20. First, the ALJ noted that "[d]uring August 2019, [Cottingham] reported that things were going well overall; [he] reported that his headaches are significantly improved[.]" *Id.* at 20. Second, the ALJ noted that in "March 2020, [Cottingham] reported his migraines are better since he obtained reading glasses[.]" *Id.* But the ALJ does not address the myriad other medical records relating to Cottingham's headaches. Particularly striking in this regard is the ALJ's failure to acknowledge that Cottingham was treated at the emergency room in March 2023 for a headache. *See Admin. Tr.* at 1582–1725 (UPMC emergency room records). Instead of including any discussion—or even mention—of that treatment in relation to Cottingham's headaches, the ALJ cherry

picks certain statements from the emergency room record (without acknowledging that it is an emergency room record) and states as follows:  "During March 2023," Cottingham "denied experiencing fatigue, weakness, and a gait problem and [he] was assessed with clinical examination findings of intact extraocular movements, intact visual fields, and normal finger to nose and heel to shin tests" and Cottingham "was noted to be alert and oriented times three and [he] was assessed with clinical examination findings or a normal mood, a normal affect, and normal behavior." *Id*. at 20, 21.  Moreover, the ALJ's discussion does not address the requirements of Listing 11.02B or 11.02D or the factors set forth in SSR 19-4p. Although lengthier than his discussion at step three, the ALJ's discussion of Cottingham's headaches in connection with his RFC assessment is similarly cursory.

In sum, the ALJ's conclusory step three analysis—even when coupled with his later RFC assessment—fails to adequately address whether Cottingham's migraine headaches are equivalent to Listing 11.02 in accordance with SSR 19-4p, which "prevents the Court from conducting a meaningful, albeit deferential, review." *Falardo-Weller*, 2023 WL 6119101 at *8, *9 (finding the ALJ's analysis regarding step 3 and Listing 11.02 to be deficient, vacating the Commissioner's decision, and remanding the case for further proceedings); *see also Amy B. v. Bisignano*, No. 1:24-CV-02091, 2026 WL 567656, at *8 (M.D. Pa. Jan. 28, 2026)

29

(recommending that the Commissioner's decision be vacated because the ALJ failed to evaluate on the record the applicability of 11.02B and 11.02D, thus preventing the court from conducting a meaningful review), *report and recommendation adopted*, 2026 WL 565809, at *1 (M.D. Pa. Feb. 27, 2026); *Fewell*, 2024 WL 4182115, at *6 (same), *report and recommendation adopted*, 2024 WL 4173790 (M.D. Pa. Sept. 12, 2024); *Tyson*, 2022 WL 3975002, at *15 (same), *report and recommendation adopted*, 2022 WL 3971041 (M.D. Pa. Aug. 31, 2022).

The question then is whether the ALJ's error was harmless. "Ordinary harmless error review, in which the appellant bears the burden to demonstrate harm, is applicable to administrative appeals." *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Thus, a claimant must explain "'how the . . . error to which he points could have made any difference.'" *Id.* (quoting *Shinseki v. Sanders,* 556 U.S. 396, 413 (2009)). "An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011). Although an error may be harmless, we must be mindful that "'[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.'" *Fargnoli*, 247 F.3d at 44 n.7 (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

30

As set forth above, Cottingham has presented a lengthy a summary of his medical records pertaining to his headaches that may support application of the listing. Given those extensive records, we cannot say that the ALJ's error was harmless, and we will vacate the ALJ's decision.

## C.  Other Claims.

Given our conclusion that the Commissioner's decision must be vacated based on the ALJ's error at step 3, we will not address Cottingham's remaining claims of error. "Plaintiff's additional claims of error may be remedied through the case's treatment on remand." *Brown v. Saul*, No. CV 3:18-1619, 2020 WL 6731732, at *7 (M.D. Pa. Oct. 23, 2020), *report and recommendation adopted*, 2020 WL 6729164, at *1 (M.D. Pa. Nov. 16, 2020). "A remand may produce different results on these claims, making discussion of them moot." *Id*.

## D.  Remand is the appropriate remedy.

Because the ALJ's decision is not support by substantial evidence, the question then is whether the court should remand the case to the Commissioner for further proceedings or award benefits to Cottingham. We conclude that remand is the appropriate remedy.

Under sentence four of 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Thus, although a remand is often the appropriate remedy, the court may also enter an order awarding the claimant benefits. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 358 (3d Cir. 2008) (remanding the case to the district court with directions to enter an order awarding the payment of benefits); *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (same); *Podedworny v. Harris*, 745 F.2d 210, 223 (3d Cir. 1984) (same). But an "award [of] benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221–22. Whether there has been excessive delay and/or prior remands also bears on whether to award benefits or to remand for further proceedings. *Diaz v. Berryhill*, 388 F. Supp. 3d 382, 391 (M.D. Pa. 2019). "Thus, in practice any decision to award benefits in lieu of ordering a remand for further agency consideration entails the weighing of two factors: First, whether there has been an excessive delay in the litigation of the claim which is not attributable to the claimant; and second, whether the administrative record of the case has been fully developed and substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id*.

Here, although Cottingham's claims have been pending since 2018, given the remand from the Appeals Council and the multiple hearings, we cannot say, at this point, that the delay in the litigation of Cottingham's claims has been excessive. Moreover, we cannot say that substantial evidence on the record as a whole shows that he is disabled and entitled to benefits. Thus, we will remand the case to the Commissioner for further proceedings.

## VI. Conclusion.

For the foregoing reasons, we will vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). An appropriate order follows.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge